**Deborah ROBERSON, Plaintiff–Appellee/Cross–Appellant,**

v.

**UNIVERSITY OF TENNESSEE, Defendant–Appellant/Cross–Appellee.**

Court of Appeals of Tennessee, Eastern Section.

Jan. 15, 1992.

Jerrold L. Becker, Lockridge & Becker, P.C., Knoxville, for plaintiff-appellee/cross appellant.

Beauchamp E. Brogan, Ronald C. Leadbetter, The University of Tennessee, Knoxville, for defendant-appellant/cross-appellee.

## OPINION

FRANKS, Judge.

Plaintiff has been employed by defendant's Agricultural Extension Service since 1980. She was eligible for a raise and promotion in 1986, and when she learned that she had not been promoted and her co-worker Richard Skillington who also had been hired as an assistant agent in 1979 was promoted, plaintiff filed an EEOC charge. Subsequently, on April 10, 1987, she brought this action for sex discrimination under the Equal Pay Act and the Tennessee Human Rights Act and alleged defendant had retaliated against her for filing the EEOC charge. After a lengthy jury trial, plaintiff was awarded a judgment of $13,600.00 on her discrimination claim and $50,000.00 on her retaliation claim. In a memorandum opinion concurring with the jury verdict, the Trial Judge said that a reasonable juror could have found the way plaintiff's evaluation scores were calculated was discriminatory. He added, there was "abundant" circumstantial evidence of retaliation. The Chancellor, upon consideration of the claim for attorneys' fees, pursuant to the criteria imposed by *United Medical Corporation v. Hohenwald,* 703 S.W.2d 133 (Tenn.1986), awarded attorneys' fees and expenses in the amount of $26,000.00. Defendant has appealed the judgment and plaintiff's attorneys have appealed the award of attorneys' fees.

■ There is material evidence that defendant discriminated against plaintiff on the basis of sex, and retaliated for her filing an EEOC charge.

Both the Tennessee Human Rights Act, Tennessee Code Annotated § 4–21–401, and the Equal Pay Act, 29 U.S.C. § 206(d)(1) prohibit sexual discrimination in employment. The Tennessee Human Rights Act provides in pertinent part:

"4–21–401. **Employer Practices.**—(a) It is a discriminatory practice for an employer:

(1) To fail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin; ..."

The Equal Pay Act provides:

**"Prohibition of sex discrimination**

(d)(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."

The U.S. Sixth Circuit Court has long applied the Title VII discrimination analysis to claims arising under the Equal Pay Act. See *Korte v. Diemer*, 909 F.2d 954, 957 (6th Cir.1990) citing *Odomes v. Nucare, Inc.*, 653 F.2d 246 (6th Cir.1981). Initially, plaintiff must establish the employer pays different wages to employees of the opposite sex for comparable jobs. The burden then shifts to the employer to show that the differential is justified under one of the Act's four exemptions, 909 F.2d at 957, citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974).

In this case, the employer argues there is no material evidence to support the verdict and that its management by objective (MBO) system evaluation was based strictly on merit.

It is not seriously contended that plaintiff did not make out a prima facie case, because Skillington, the male employee who did comparable work, earned more money and received promotion in the year he was eligible. The focal point is whether defendant's failure to promote plaintiff was based on lack of merit or on the basis of her sex. The material evidence supporting the jury's verdict is that plaintiff's MBO scores were adjusted downward without her knowledge after she had signed off on them, but before they were submitted to the Dean who had ultimate authority to make pay and promotion decisions about extension agents. Since the Dean did not know plaintiff personally, he had no way of knowing whether the scores appeared unreasonably low, but defendant places much emphasis on the objectivity of the MBO score in its argument. However, it is the way scores were calculated that cast doubt about whether the scores reflected plaintiff's performance. The MBO scores fall between 1 and 5, and newcomers typically receive average rating in the 3 range. Agents who aspire to promotions earn ratings in the 4 range and no agent can receive more than a 5. In plaintiff's case, her early years' scoring was in the 3 range, but beginning in 1984 her original MBO scores were 4s. However, unknown to her, they were adjusted downward to 3.

At the time plaintiff inquired why her peer earned more money than she, defendant's management provided contradictory answers. First, her manager denied that Skillington made more money, then plaintiff was told that Skillington made more money because he was a man with a family to support. Finally the Dean sent plaintiff a letter advising the relatively low MBO scores and her failure to take extra course work had kept her from receiving a raise and promotion. Merit was but one of the defendant's three explanations for the distinction made between the agents, and the jury was the judge of this fact issue.

Both agents had generated complaints during their decade-long tenure. For example, plaintiff was criticized for having an unlisted telephone number, which made her less accessible to 4–H parents, and for failing to chaperone a group properly in 1981. Her supervisors praised her creativity and office decor, while they bemoaned her "fierce independence" and an allegedly abrasive personal style. According to her supervisors, such criticisms as these kept

plaintiff's MBO scores low, but complaints against Skillington for serious infractions did not weigh against him. When Skillington got into a fist fight with someone at the county fair, a supervisor remarked that his opponent "probably deserved it". A local paper accused Skillington of cheating in a food contest at the fair. When a minister whose son was in Skillington's 4-H club complained about Skillington's performance by letter, and withdrew his son from 4-H in protest, nothing was done. Reasonable jurors could conclude that complaints about Roberson weighed more heavily than complaints about Skillington because of her sex.

There was also evidence that plaintiff was a better employee than her MBO scores indicated. She ran an award-winning 4-H program for several years. She had a reputation in the community as a creative 4-H leader and adult women's homemaker groups actively recruited her as their own leader. There was evidence that MBO scores and personnel reports were not always accurate indicators of performance generally.

The evidence supports the Trial Judge's observation that evidence of defendant's retaliation against plaintiff after her 1986 EEOC charge was "substantial".

Tennessee Code Annotated, § 4-21-301 provides:

"Discriminatory Practices.—it shall be a discriminatory practice for a person or for two (2) or more persons:

(1) To retaliate or discriminate in any manner against a person because he or she has opposed a practice declared discriminatory by this chapter or because he or she has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding, or hearing under this chapter;
...."

One of defendant's supervisors admitted outright that he stopped recommending plaintiff for promotion because she had filed the EEOC charge. After the charge was made, defendant's management began

taking an extraordinary amount of time and effort over small matters, when they concerned plaintiff. She was asked to drive to Nashville for a 15 minute meeting about how to prepare some of her reports. When she asked to leave camp at 9:00 p.m. to spend the night with her ill child and return each morning, her managers only allowed her to leave long after 9:00 p.m., and warned her they were monitoring her movements.[1] Finally, when an adult homemaker's group inquired of plaintiff's management why there had been a delay in transferring her, they were advised that her lawsuit was the cause of the delay.

■ Defendant questions the propriety of the damage award. From 1980 to 1990, Skillington earned $13,638.00 more than plaintiff. The jury awarded plaintiff $13,-600.00.

The award of $50,000.00 is also supported by material evidence. Tennessee Code Annotated § 4-21-701 provides for recovery of actual damages, damages for emotional distress, attorneys' fees, costs and punitive damages for Human Rights violations. There is testimony that plaintiff suffered emotional damages from 1986 to the time of trial, as a result of retaliation and discrimination. There is evidence of extreme stress, embarrassment before her peers, and problems with eating and sleeping which significantly affected her relationships with others. In 1986 she suffered two miscarriages, although no expert testified as to the cause. The parties stipulated that plaintiff was under the care of a physician for work-related emotional problems and was taking medication. She also sought counseling with a minister.

Finally, we conclude the Trial Judge awarded adequate attorneys' fees. In *United Medical Corporation*, the Supreme Court adopted factors from DR2-106(B)(1)(8) of the Code of Professional Responsibility for setting fees. The factors are:

1. The time devoted to performing the legal service.

---

1. One of defendant's witnesses was asked if Skillington had ever been allowed to leave the camp at odd hours, and the witness responded that he probably had to attend a calf show.

2. The time limitations imposed by the circumstances.

3. The novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly.

4. The fee customarily charged in the locality for similar legal services.

5. The amount involved and the results obtained.

6. The experience, reputation, and ability of the lawyer performing the legal service.

In this case, plaintiff had employed three lawyers in the course of the action, with some duplication of work. The Trial Judge awarded $25,000.00 in fees, and costs of $1,000.00. He based the award on the above factors, and we find no abuse of discretion.

The judgment of the Trial Court is affirmed on all issues and the cause remanded to the Trial Court with costs of the appeal assessed to the Appellant, and upon remand the Trial Court will establish a reasonable fee for plaintiff's lawyers for representing plaintiff on the appeal.

GODDARD and McMURRAY, JJ., concur.